CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 10 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DAVID JR. ATKINS, ) | |
| Plaintiff, ) | Civil Action No. 7:06cv00636 |
| ) | |
| ) | **MEMORANDUM OPINION** |
| ) | |
| MEDICAL DEPT. OF MIDDLE ) | |
| RIVER REGIONAL JAIL, <u>et al.</u>, ) | By: Hon. Glen E. Conrad |
| Defendants. ) | United States District Judge |

Plaintiff David Jr. Atkins, a Virginia inmate proceeding <u>pro se</u>, brings this action under the Civil Rights Act, 42 U.S.C. § 1983, alleging that the Medical Department of the Middle River Regional Jail ("MRRJ")[1] and two of the jail's health care providers, Moises E. Quinones, M.D., and Cathy Riley, R.N., violated his constitutional rights. Plaintiff alleges that, while alone in his cell on May 5, 2006, he suffered a seizure because he had been denied treatment for hypoglycemia. He claims that, when he was previously incarcerated at the Augusta County Jail ("Augusta") in 2003, he presented a note from a doctor that he was to have a special diet and that, at MRRJ in 2006, he was being denied the special diet. He also claims that medical doctors issued an order on May 11, 2006, placing him on observation as a follow-up to the seizure, but that the observation was not started until May 18, 2006. Plaintiff seeks $5,000,000.00 in damages.

Defendants have filed a motion for summary judgment, and plaintiff has responded. Therefore, the complaint is ripe for the court's review. For the reasons that follow, the court will grant summary judgment in favor of the defendants.

---

[1] The Medical Department of MRRJ is not an entity subject to suit under § 1983; therefore, any claims against the Medical Department must be dismissed. See <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 71 (1989).

## I. Factual Summary[2]

Plaintiff was incarcerated at Augusta[3] on seven different occasions between July 29, 2003, and July 16, 2005.[4] On April 1, 2006, he was transferred to MRRJ, where he remained until December 1, 2006, when he was transferred to the Virginia Department of Corrections ("VDOC") to carry out his sentence.

Plaintiff alleges that in 2003, he submitted a doctor's note[5] recommending a diet of double portions and snacks. The record indicates that, when plaintiff was booked into Augusta on July 29, 2003, he claimed a religious preference for a no-pork diet. He informed medical at Augusta that he was diabetic and taking Glucophage, and he demanded a special diet, upon which he was placed.

On August 6, 2003, it was confirmed that the dietary information plaintiff had provided to the medical staff was incorrect.[6] Plaintiff's blood sugar had not been low or elevated while he was incarcerated, and he subsequently was removed from the special diet. Thereafter, when plaintiff was

---

[2] The facts have been adduced from the record, including plaintiff's complaint, supplemental pleadings, and additional evidence, totaling 217 pages (exclusive of procedural submissions and plaintiff's changes of address), and defendants' motion for summary judgment and documents submitted in support thereof, which includes plaintiff's 110-page medical record from MRRJ.

[3] Augusta closed on March 31, 2006, and inmates housed there were transferred to MRRJ.

[4] The following are the dates upon which plaintiff was incarcerated at Augusta: July 29, 2003; October 15, 2003; January 23, 2004; March 22, 2004; January 12, 2005; February 16, 2005; and July 16, 2005.

[5] Specifically, he claims that he presented a note from Emergicare, a walk-in primary care facility in Harrisonburg, Virginia. Plaintiff has presented a copy of a note from Emergicare, dated May 8, 2003, that states that plaintiff was prescribed glucose tablets pursuant to a diagnosis of hypoglycemia. The note is included in plaintiff's medical record.

[6] Plaintiff submitted a copy of the Augusta medical record entry for that date, which states that the information that plaintiff was diabetic and taking Glucophage "is incorrect," and continues:

> Spoke [with inmate] and his girlfriend. [Inmate] has had hypoglycemic episodes and uses glucose tabs. Blood sugar has not been low or elevated since [inmate] has been here. [Inmate] taken off diabetic diet. [Inmate] may keep glucose tabs [with] him.

2

admitted to Augusta on March 22, 2004, he answered "No" to inquiries whether he was on a special diet prescribed by a physician or on a special diet because of religion.

In April 2004, it was noted that plaintiff's blood sugar was somewhat low at 57, and he was given sugar tabs. His blood sugar was monitored on April 11, 2004, and May 4, 2004, at which time it was within normal range.[7] Laboratory analysis on April 29, 2004, showed plaintiff's glucose at 77. On April 1, 2004, the medical staff at Augusta requested records from the Medical College of Virginia Hospital ("MCV"). The records from MCV were received at Augusta on April 29, 2004. The records from MCV showed that plaintiff, who was an inmate at Lunenberg Correctional Center ("Lunenberg") when he was treated at MCV, had been evaluated for hypoglycemia in 2001 and 2002, and proposed that he be hospitalized to evaluate him for fasting hypoglycemia.[8] Records do not indicate that this was ever done; however, the final entry in the MCV records states that plaintiff "reports he will be released from incarceration in 4 days and is agreeable to admission for [further]

---

[7] In the Memorandum in Support of Defendants' Motion for Summary Judgment, defendants state: "Normal ranges for glucose levels are 60-110 mg/dL." THE MERCK MANUAL OF MEDICAL INFORMATION (Home Edition, 1997) ("MERCK MANUAL") states: "Blood sugar levels are normally between 70 and 110 milligrams per deciliter (mg/dL) of blood in the morning after an overnight fast." Id. at 717. However, the MERCK MANUAL also states that "[t]he symptoms of hypoglycemia rarely develop until the blood sugar level falls below 50 milligrams per deciliter." Id. at 725. Additionally, other sources state that "[n]o single glucose value alone serves to define the medical condition termed hypoglycemia for all people and purposes," and that, "[a]lthough 60 or 70 mg/dl (3.3 or 3.9 mmol/l) is commonly cited as the lower limit of normal glucose, different values (typically below 40, 50, 60, or 70 mg/dl) have been defined as low for different populations, clinical purposes, or circumstances." See http://en.wikipedia.org/wiki/Hypoglycemia.

[8] Contrary to plaintiff's assertion, the records he has submitted from MCV, many of which are undated, do not state or conclude that he "is a true hypoglycemia [sic]." Rather, the MCV records describe plaintiff in the following terms: "with suspected hypoglycemia"; "formerly smoked heroin"; and reporting a "[history] of hypoglycemic symptoms." (Emphasis added.) The MCV record also states that plaintiff "gives an excellent story for fasting hypoglycemia, and has documented fasting blood glucose readings <40 mg/dl"; however, the court is unable to find documentation in the MCV record of laboratory blood glucose readings. The MCV record includes an indecipherable insulin-glucose ratio. The MCV record also includes a glycosylated hemoglobin (abbreviated as "$Hb_{A1c}$") reading of 5.3, which is normal according to the standard reference ranges of the International Diabetes Federation and American College of Endocrinology and the American Diabetes Association. See http://en.wikipedia.org/wiki/Hba1c; MERCK MANUAL at 722-23.

3

evaluation."[9]

On February 16, 2005, while incarcerated at Augusta, plaintiff was seen in medical, where it was noted that he was very drowsy, kept falling asleep, and moved very slowly. He denied drug use. It was further noted, however, that he had prescription bottles for Hydrocodone, Oxycodone, and Valium. Plaintiff stated that he was being treated for a back injury and that he was hypoglycemic.[10] Officers at Augusta were advised to keep him in the holding unit for observation until the next day.

On February 17, 2005, it was noted that plaintiff was to be on a no-pork diet, that he was to take Motrin, that he continuously requested Valium, and that he appeared drowsy. He was returned to the cellblock on February 18, 2005. Dr. Moore[11] saw plaintiff on February 18, 2005, and ordered that he be placed on a no-concentrated-sweets diet.

On March 29, 2005, plaintiff complained that the Motrin hurt his stomach. Accordingly, Dr. Moore discontinued the Motrin, and plaintiff was started on Zantac for acid reflux. On April 1, 2005, plaintiff refused to see Dr. Moore. On April 3, 2005, plaintiff complained of cracking and peeling toes, for which he was prescribed antifungal cream.

Plaintiff was again processed into Augusta on July 16, 2005. During his medical screening

---

[9] The record does not indicate that plaintiff followed-up with MCV, or any other medical provider, for a complete fasting evaluation after his release.

[10] The Medical Department at Augusta requested records concerning plaintiff's alleged hypoglycemia from Patient Care Walk-In Clinic ("Patient Care") in Staunton, Virginia. On February 16, 2005, in answer to Augusta's inquiry, Patient Care faxed a letter to Augusta stating that Patient Care had treated plaintiff "for a back strain due to a work related injury from 10/11/2004" and that it had "no record on file" regarding plaintiff's alleged hypoglycemia.

[11] Dr. Moore, who was employed at Augusta, but apparently not at MRRJ, is not a party to the instant lawsuit. However, Nurse Riley, who formerly was employed at Augusta, is employed at MRRJ and is a party to this suit.

he stated that he was hypoglycemic and was supposed to receive double portions at meal times. Nurse Riley reviewed plaintiff's medical chart and did not find a diet order directing double portions for plaintiff.

On July 22, 2005, Dr. Moore saw plaintiff, who complained of lower back pain and "rashy" feet, but did not complain of blood sugar problems.[12] Plaintiff was seen again by Dr. Moore on September 7 and 13, 2005, for lower back pain, but had no complaints about his blood sugar. On October 8, 2005, plaintiff submitted a medical request form on which he inquired as to why he had not been placed on a proper diet or otherwise treated for hypoglycemia; plaintiff received a response stating that there was no documentation indicating that he suffered from hypoglycemia. Plaintiff was treated for a sore throat on October 20, 2005, but had no complaints about his blood sugar.

Plaintiff filed a formal grievance on October 24, 2005, seeking a diet change as treatment for alleged hypoglycemia. Nurse Riley responded, advising plaintiff that the diet order he requested could not be issued without documentation that he suffered from hypoglycemia. On October 26, 2005, plaintiff complained to Nurse Golden[13] that he was hypoglycemic and that he was feeling shaky and sweaty at times. His blood sugar reading was 74, which is within the normal range. Nurse Golden gave him three sugar pills. Plaintiff's blood sugar was checked three hours later, when it was recorded as 89, within normal range.

Plaintiff was next treated in medical on January 5, 2006, for an injury to his ankle, received in recreation. He did not complain of low blood sugar. The presence of some swelling was noted; additionally, it was noted that plaintiff "screamed" and "hollered" when the nurse barely touched

---

[12] Plaintiff subsequently filed grievances complaining about being charged for the examination.

[13] Nurse Golden is not a party to the instant lawsuit.

5

him. He was given an ice pack, told to elevate his ankle, and was instructed to be reexamined in one week if there was no improvement. He returned the next day for his ankle injury; he did not complain of low blood sugar. Plaintiff was taken off recreation for one month and was given a prescription for Motrin. The following day, plaintiff returned to medical, having remembered that he could not tolerate Motrin, and he was switched to Tylenol. He did not complain of low blood sugar. On February 7, 2006, plaintiff's foot was reexamined by Dr. Moore, who ordered an x-ray. Plaintiff did not complain of low blood sugar.

On February 11, 2006, plaintiff filed a grievance containing the following complaint: "Now on the [sic] 2-7-06 I had a blood sugar check of 66, which is low. This is the third time this has happen [sic] and medical refused to put me of [sic] the proper diet or get my medical records from D.O.C."

On February 13, 2006, plaintiff requested assistance for an allergic reaction. No hives were noted. His breathing was normal. He did not complain of low blood sugar. Medical was summoned to the hallway where plaintiff was seen sitting, shaking his feet and legs, sweating profusely. Officers reported that he had been observed in the recreational field running and playing basketball. His blood sugar was recorded as 109. Plaintiff advised that he had a glucose tablet that he had obtained at the old jail and stated, "I must have taken it too late." He was given water. His condition improved, and plaintiff requested to be returned to his cellblock. He was advised to drink plenty of unsalted, unsugared water and to rest.

On February 21, 2006, Nurse Riley responded to plaintiff's grievance of February 11, 2006, advising plaintiff that "66 mg/dl is not considered low" and that the plaintiff's medical records contained no diagnosis of hypoglycemia. Nurse Riley further advised plaintiff to request to see Dr.

Moore for dietary changes.

On April 10, 2006, after being transferred to MRRJ, plaintiff submitted an inmate request form, asking to receive double portions as treatment for hypoglycemia. In response, plaintiff was advised that his medical records from VDOC "do not indicate treatment of hypoglycemia." (Emphasis added.) Plaintiff then filed a formal grievance alleging that the Medical Department had "lied" about the fact that his medical records did not indicate that he had received treatment for hypoglycemia. On April 19, 2006, Nurse Riley responded to plaintiff's grievance, stating: "Mr. Atkins, we have addressed this situation in the past. Your DOC records show that you had a work-up but no diagnosis of hypoglycemia given. You may want to see the new physician about this."[14] (Emphasis added.)

On May 5, 2006, plaintiff was found alone in his cell, bleeding from a 3" laceration to the top of his scalp and a 1" laceration to the left maxilla area of his face; he also had a penny-sized abrasion on his right elbow and superficial scrapes at the midline of his upper chest. Plaintiff was ambulatory; he stated that he did not know what had happened, but that he may have had a seizure. His blood sugar was 112. He was alert and oriented. He had hand tremors. His skin was warm and dry to the touch. He is described as "incontinent of bowel but not of urine."

Plaintiff was taken to the Augusta Medical Center Emergency Room ("ER"). At the ER, it

---

[14] Following the denial of the grievance, plaintiff filed a complaint in this court, alleging that, while he was incarcerated at Augusta, Dr. Moore had refused to treat his hypoglycemia, and Nurse Riley had improperly concluded that his blood sugar readings were not low. See Civil Action No. 7:06-cv-00251. On June 28, 2006, this court dismissed the complaint for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915A(b)(1). The court observed that plaintiff alleged that, as a result of not receiving proper treatment for hypoglycemia, he had a seizure at MRRJ on May 5, 2006, but that nurses at MRRJ had opined that the seizure was heat-related. The court further observed that the incident at MRRJ on May 5, 2006, was not the subject of that civil action, and noted: "If the plaintiff believes that officials at [MRRJ] have provided constitutionally inadequate treatment, he may file such claims in a separate civil action, naming appropriate defendants."

was noted that plaintiff reported a history of seizures associated with low blood sugar, that he was not taking insulin or any other hypoglycemic agents, and that he denied ever taking any seizure medications. His glucose was measured at 89. His lacerations were stapled and stitched, he was prescribed Dilantin[15] for seizures, and he was then discharged.

Upon plaintiff's return to the jail, he was observed sleeping. When he awoke, he was alert and oriented, and his stitches were intact. He complained of being sore, but did not complain of any other injuries. On May 11, 2006, his stitches were removed, although the staples remained, and plaintiff was seen for the first time by Dr. Quinones. Plaintiff complained that his blood sugar was not being taken care of and that his eating habits were changed. This is the first instance of plaintiff making such a complaint to a medical doctor since his admission to Augusta on July 16, 2005. Plaintiff demanded double portions and a snack. Plaintiff was admitted to the infirmary for observation. It was noted that plaintiff was uncooperative and not forthcoming with information pertaining to his blood sugar.

Plaintiff was monitored in the infirmary. At no time did plaintiff suffer any signs or symptoms of seizure activity in the infirmary. Plaintiff had no complaints on May 12, 13, or 14, 2006. On May 15, 2006, he asked to have the staples removed. On May 17, 2006, plaintiff inquired when he could return to his pod. A diabetic flow sheet, begun on May 18, 2006, indicates the levels of plaintiff's blood sugar during his stay in the infirmary. Only one abnormal reading was noted, on May 20, 2006, when his blood sugar was recorded at 48; breakfast was on its way, and he was given

---

[15] Dilantin, the trademarked name for phenytoin, is an anticonvulsant for the prophylactic management of grand mal seizures with complex symptomatology and for the treatment of neuropathic pain syndromes. See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 469, 1278 (28th ed. 1994); http://en.wikipedia.org/wiki/Dilantin.

a snack in his cell. On May 21, 2006, his blood sugar was 66, he complained of being a little shaky, and he was given a snack. He was alert and oriented, and no signs or symptoms of seizures were noted. On May 22, 23, and 24, 2006, plaintiff had no complaints; however, he was caught stealing lancets.[16] Dr. Quinones discharged plaintiff from the infirmary on May 24, 2006, and he was returned to his cell.

On June 1, 2006, it was noted that plaintiff again attempted to steal lancets. On July 13, 2006, Nurse Riley spoke with Dr. Quinones about the Dilantin levels in plaintiff's blood. The laboratory work showed less than 2.5 mg when the normal range for plaintiff's dosage was 10-15mg. Dr. Quinones directed that staffers were to crush the tablets and observe plaintiff to ascertain that he swallowed the Dilantin. Medical was scheduled to check his Dilantin levels again in three weeks; however, on July 27, 2006, plaintiff refused any further treatment with Dilantin for his seizures, and signed a refusal treatment form.

On August 22, 2006, Nurse Riley noted that no seizure activity had been reported for the preceding month. On October 24, 2006, plaintiff filed the instant complaint.[17]

The court will include additional facts as necessary in its discussion.

## II. ANALYSIS

In order to state a cognizable claim for denial of medical care under the Eighth Amendment, a plaintiff must allege facts sufficient to demonstrate a deliberate indifference to a serious medical

---

[16] A lancet is a surgical knife with a pointed, double-edged blade. It is also a blood-sampling device used to prick the skin to obtain a sample of blood recovering for testing; often used by diabetics during blood glucose monitoring. The record is unclear as to which type of lancet plaintiff attempted to steal.

[17] The record indicates that, on October 30, 2006, Nurse Riley noted that plaintiff continued to do well without any reports of seizure activity, lightheadedness, or dizziness. On November 30, 2006, Nurse Riley noted that no seizure activity had been reported for the preceding month.

9

need. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish deliberate indifference, a plaintiff must present facts to evince that the defendants had actual knowledge of and disregard for an objectively serious medical need. Farmer v. Brennan, 511 U.S. 825 (1994); see also, Rish v. Johnson, 131 F.2d 1092, 1096 (4th Cir. 1997). Disagreements between an inmate and medical personnel over diagnosis or course of treatment and allegations of malpractice or negligence in treatment are not cognizable constitutional claims under the Eighth Amendment. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Estelle, 429 U.S. at 105-06. To bring such a claim against non-medical prison personnel, an inmate must show that such officials were personally involved with a denial of treatment, deliberately interfered with a prison physician's treatment, or tacitly authorized or were indifferent to the prison physician's misconduct. Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990). Additionally, an inmate is not entitled to unqualified access to health care; the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). Indeed, in the context of short-term prisoners, states may outright deny inmates elective medical treatment. Kersh v. Bounds, 501 F.2d 585, 588-89 (4th Cir. 1974).

Plaintiff complains that Nurse Riley and Dr. Quinones were deliberately indifferent to his hypoglycemia, which allegedly led to a seizure on May 5, 2006. He also claims that Nurse Riley failed to monitor him for one week after the seizure. Plaintiff's claims lack evidentiary support. The record indicates that, during plaintiff's periods of incarceration at Augusta and MRRJ, his glucose

10

Case 7:06-cv-00636-GEC-mfu   Document 50   Filed 07/10/07   Page 10 of 13   Pageid#: 436

levels have remained within normal ranges, except for a few occasions, when plaintiff was promptly treated. Contrary to plaintiff's assertions, there is no record that a diet order was ever issued directing that plaintiff was to receive double portions at mealtime. And, although he had opportunities to do so, and was instructed to do so by nurses, including Nurse Riley, plaintiff did not complain to a medical doctor that he was supposed to receive double portions until <u>after</u> the incident on May 5, 2006. After the seizure episode, plaintiff was prescribed Dilantin, which was discontinued at plaintiff's insistence, and <u>there is no evidence that the injuries received on May 5, 2006, were caused by, preceded by, or followed by abnormal blood levels</u>.[18] Moreover, plaintiff has had no other seizures or significant blood sugar-related incidents.

Although it is possible that plaintiff may have suffered from periodic hypoglycemia while incarcerated at MRRJ, it is clear that his medical condition has been monitored and treated by medical staff. From the time plaintiff was incarcerated at Augusta on July 16, 2005, until the seizure episode of May 5, 2006, plaintiff suffered from only two episodes of lightheadedness or dizziness, and in each of those instances, <u>neither of which revealed abnormally low blood sugar</u>, plaintiff was successfully treated. There is no evidence that Dr. Quinones, who never saw plaintiff until <u>after</u> the incident on May 5, 2006, or Nurse Riley knew or should have known that plaintiff would suffer a seizure or that he was susceptible to a serious medical need that would have been prevented with a dietary change.

Nor is there any substance to plaintiff's claims that defendants were deliberately indifferent

---

[18] When plaintiff was brought to the Medical Department on May 5, 2006, he clearly had an injury involving several lacerations; however, this is not the injury of which plaintiff complains. The ER physician who treated plaintiff on May 5, 2006, attributed the seizure to a cause for which Dilantin, an anti-seizure medication, was the appropriate treatment, not a blood sugar medication or diet change.

11

to plaintiff's medical needs after his return from the ER to MRRJ. Plaintiff's claim that he was not monitored for one week after his return to jail is belied by the record, which shows that, in fact, he resided in the infirmary and was monitored during this period. That there was a one-week lapse between the issuance of an order directing the monitoring of his blood sugar and the commencement of the monitoring does not establish deliberate indifference to a serious medical need.

Plaintiff sustained injuries of an unknown origin while alone in his cell. There is no evidence that these injuries were related to abnormal blood sugar levels, or that defendants were aware of any serious risk to plaintiff's health. Plaintiff was treated and monitored subsequent to the incident on May 5, 2006. The record indicates that plaintiff has not alleged an objectively serious medical need and that his constitutional rights have not been violated. Inasmuch as the crux of plaintiff's complaint amounts to a mere disagreement between an inmate and medical personnel over his diagnosis, his claim would arise, if at all, under state medical malpractice laws, and does not present a colorable claim under § 1983.[19] See Estelle, 429 U.S. at 105-106; Wright, 766 F.2d at 849.

---

[19] The court notes that plaintiff may have been a pre-trial detainee while he was confined at Augusta and MRRJ, and that the claims of a state pre-trial detainee should be evaluated under the Due Process Clause of the Fourteenth Amendment instead of the Eighth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535-538 (1979). However, as a practical matter, the contours of the Due Process Clause in the prison context tend to be coextensive with the substantive constitutional principles applied via the Eighth Amendment to convicted inmates. Riley v. Dorton, 115 F.3d 1159, 1166-67 (4th Cir. 1997) (excessive force); Hill v. Nicodemus, 979 F.2d 987, 991-92 (4th Cir. 1992) (medical needs). As the court has explained in the foregoing analysis of plaintiff's Eighth Amendment claim, plaintiff's constitutional rights have not been violated. Plaintiff has not alleged an objectively serious medical need, and his complaint amounts to a mere medical disagreement between an inmate and medical personnel over his diagnosis, which does not present a colorable claim under § 1983

Moreover, due process proscribes punishment of a detainee before proper adjudication of guilt has been accomplished. Bell, 441 U.S. at 535-538. Accordingly, in evaluating the constitutionality of conditions of confinement for pretrial detainees, the court must determine whether the challenged conditions amount to punishment. Id. Unless the detainee plaintiff can show that officials intended to punish him through conditions of confinement, conditions cannot be considered punishment so long as they are rationally connected to a legitimate, nonpunitive penological purpose and are not excessive in relation to that purpose. Id. Plaintiff has not shown that there was a serious medical need to which defendants were deliberately indifferent, much less that they intended to punish him.

### III. CONCLUSION

Based on the foregoing, the court will grant summary judgment in favor of Nurse Riley and Dr. Quinones. An appropriate order will be entered this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

ENTER: This 10th day of July, 2007.

/s/ Jack Conrad
United States District Judge

13